## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
DOUGLAS M. KELLY,                                )
                                                 )
            Plaintiff                            )        CIVIL ACTION NO. 17-12193-LTS
                                                 )
v.                                               )
                                                 )
WATERS CORPORATION and                           )
NuGENESIS TECHNOLOGIES CORPORATION,              )
                                                 )
            Defendants                           )
_____)

### PLAINTIFF'S TRIAL BRIEF

I.       **Introduction**

Douglas M. Kelly ("Kelly" or "Plaintiff") brought this action against Waters Corporation

("Waters" or "Defendant"), legal successor to NuGenesis Technologies Corporation ("NTC") and against

NTC (or "Defendant"), a wholly owned subsidiary of Waters, to recover damages Kelly suffered as a

result of breaches by NTC and Waters of the Asset Purchase Agreement executed by Kelly and NTC (the

"APA").  Kelly submits the following trial brief in connection with the second phase of the trial of the

above-captioned action with regard to the question of the totality of damages owed by Defendants to

Kelly for their breaches of the APA.

II.      **Relevant Authority**

   A.  **Cases**

        *Barrie-Chivian v. Lepler*, 87 Mass. App. Ct. 683 (2015)

        *Crocker v. Townsend Oil Co*., 464 Mass. 1 (2012)

        *Curet v. Velasquez v. ACEMLA de P.R., Inc.* No. 06-1014 (ADC) 2010 U.S.Dist. LEXIS 143636
        (D. P.R. March 31, 2010) (Delgado-Colon, J.)

        *Demoulas v. Demoulas Super Mkts., Inc.*, 424 Mass. 501 (1997)

        *Harrington v. Fall River Hous. Authy.*, 27 Mass. App. Ct. 301 (1989)

*Hlatky v. Steward Health Care System, LLC*, 484 Mass. 566 (2020)

*MacKeen v. Kasinskas*, 333 Mass. 695 (1956)

*Mahoney v. Wells Fargo Bank, N.A.*, Civil Action No. 18-11593-MBB2022, U.S. Dist. LEXIS 87389 *9 (D.Mass. 2022)

*Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215 (1ˢᵗ Cir. 2005)

*Patsos v. First Albany Corp.*, 433 Mass. 323 (2001)

*Pierce v. Clark*, 66 Mass. App. Ct. 912 (2006)

*Salvas v. Wal-Mart Stores, Inc.*, 452 Mass 337 (2008)

*Septembertide Publ'g, B.V. v. Stein and Day, Inc.,* 884 F.2d 675 (2d Cir. 1989)

*Southwick v. Massachusetts Turnpike Auth.*, 339 Mass. 666 (1959)

*Stolzoff v. Waste Systems Intern., Inc.*, 58 Mass App. Ct. 747 (2003)

*Tracerlab, Inc. v. Indus. Nucleonics Corp.*, 313 F.2d 97 (1ˢᵗ Cir. 1963)

*Williams v. Ely*, 423 Mass. 467 (1996)

**B. Statutes**

M.G.L. c. 260, sec. 12

## III.  Relevant Facts

### A.  History of Archive

In 1997, the FDA published regulations 21 CFR Parts 11 and 58, which mandated that pharmaceutical companies store all electronic data produced by their instruments such that that data would be available to FDA inspectors on demand. In or around 1998, the FDA began compelling thousands of regulated pharmaceutical companies to fund and expand new electronic records compliance budgets prefatory to compliance with these new regulations. Kelly had developed software (initially called Triridian but later known as Archive) that met this critical new need in the FDA-regulated pharmaceutical industry. Kelly's Archive software provided fail-safe automated backup and retrieval of pharmaceutical companies' instrument data, writing the data to "read only" CDs (and later DVDs and RAID arrays).

In 1998, Kelly's Archive product was the only one on the market that could satisfy the new FDA regulations, and from its inception until 2003 or 2004, it was the <u>only</u> product available on the market that met the needs of the new regulations. Accordingly, the market for Kelly's product was enormous. Every regulated pharmaceutical company needed it, and there were no competitors. Archive had an effective monopoly, and not just a first-mover advantage, for approximately five years.

### B.  History of NTC

NTC was formed in 1996 and, as of late 1998, was developing a single patent-pending product, Unify/Vision ("UV"). UV was a print-to-database tool, allowing users to cut-and-paste information from different systems, converting the data to a single format, to create reports. UV was a productivity tool, allowing scientists who generated reports to do so faster and more efficiently. The first marketable version of UV was not released until June of 1999, four months after NTC acquired Archive and a second Kelly product, VP Office.

NTC hired John Helm as head of sales shortly before it acquired Archive and VP Office in February of 1999. NTC had not yet sold a UV license and the product was still several months away from being ready for sale. Mr. Helm quickly determined, after visiting several prospective customers, that NTC had grossly overestimated the market for UV. Only five out of 100 scientists in a lab would have a use for UV, not all, as NTC had thought, as only five out of 100 scientists in a given lab created reports. Thus, NTC had overestimated its market by 95%. In addition, NTC faced additional hurdles in persuading customers to adopt a new, untested product from a newly formed company with no performance history. While UV was a "nice to have" productivity tool, it also had a 12-18 month sales cycle, involving a demonstration, a pilot program, price negotiations, and then a delay while the customer sought approval for the purchase from those overseeing the budget. As a start-up seeking entry into the highly regulated pharma space, NTC also faced an additional problem in selling UV: the FDA enforcement of 21 C.F.R. part 11 required regulated pharmaceutical companies (NTC's target market) to quickly allocate significant funds to the purchase of compliance software, namely Archive, making it

more difficult to persuade customers to allocate additional money to their software purchase budgets for a productivity tool.

### C.  Negotiation of the APA

In late 1998, NTC approached Kelly with an interest in licensing and distributing Archive. Kelly already had agreements lined up with Pfizer (which was in the process of acquiring Warner Lambert) and Merck to install Archive throughout their manufacturing and laboratory sites worldwide, an executed distribution agreement with Shimadzu, and pending agreements with Perkin Elmer and Waters. NTC proposed purchasing Archive outright for stock in NTC, and Kelly declined, stating that he would only sell for cash. Merck and Pfizer, collectively, were operating approximately 50,000 lab instruments, each of which needed to be brought into compliance with the new FDA regulations. Archive single-instrument connectivity licenses for just those customers, at $500 each, would total $25 million in revenue. Archive Engine, CD Engine, and Restore licenses would add millions to that figure, and all of those licenses would generate annual revenues from maintenance agreements of over $3 million per year. Accordingly, the parties estimated that, over ten years, the revenues from the customers for Archive that Kelly was bringing to the table alone would exceed $60 million. Kelly's 60% of that revenue, adjusted for the time value of money (as half of the revenue would be coming in over a period of years), equaled the $30 million that NTC offered Kelly for Archive. The parties also correctly anticipated that many other customers would have an immediate need for Archive and agreed that Kelly was entitled to 30% of those revenues, plus a percentage of the annual maintenance revenues. In addition, Kelly had also developed another product, VP Office, which was being distributed by Shimadzu. Upon learning of the additional product, NTC agreed to also purchase VP Office, offering an additional $1 million per year in installment payments to Kelly based on sales of same.

NTC told Kelly that, as a venture capital-funded start-up, it could not make payment up front, and the payment would have to be made over time from revenues. The parties then negotiated the APA, based on the facts outlined above, which provided Kelly with either 30% or 60% of revenues from the sale of Archive (depending on Kelly's prior relationship with the customer), and 20% of annual

4

maintenance revenues, up to an annual cap, calculated to provide Kelly $30 million to $35 million over time. The parties executed the APA in February of 1999. NTC acquired Kelly's pending sales and pipeline for Archive, and it also acquired VP Office, its pending sales, and the distribution agreement with Shimadzu. With the acquisition of Kelly's software, NTC was suddenly in the software business, with accounts with major pharmaceutical companies and pending product sales. NTC had still not yet launched or sold UV, which was not released until June of 1999.

### D.  Early Sales History of NTC

Michael McGuinness, NTC's CEO at the time, learned shortly after becoming CEO that NTC had grossly overestimated the market for UV based on discussions with Mr. Helm. One of Mr. McGuiness's first orders as CEO was to "reposition" UV in the marketplace. NTC had a goal of launching an IPO. NTC understood that sales of a patented product were of greater interest to IPO underwriters for valuation purposes than sales of a non-patented product. UV was a patented product, while Archive could not be patented as too much time had elapsed since its first commercial sale. To maximize its chances of achieving $25 million dollars in sales of UV - which, NTC executives told Kelly, would allow NTC to launch an IPO with a $1 billion valuation - Mr. McGuinness launched a program to shift revenues from the "need to have" product, Archive, to the "nice to have" product, UV. NTC's plan was to merge UV and Archive into the product known as Scientific Data Management System ("SDMS") for marketing purposes, even though the two products were not inherently symbiotic.

Immediately after acquiring Archive, NTC began conflating Archive and UV in its marketing materials, implying that UV had data management, compliance, and archiving functionality and that the two products together formed a scientific data management "system." However, NTC did more than simply market UV to customers looking to acquire compliance software, which UV was not. Kelly's Archive Engine was rebranded as the SDMS engine under a new part number for which Kelly would not be and was not paid pursuant to the APA. Kelly's Restore software was rebranded as "Vision with Restore" under a new part number for which Kelly would not be and was not paid pursuant to the APA. Kelly's CD Engine was rebranded as "Offline Storage Manager" under a new part number for which

Kelly would not be and was not paid pursuant to the APA. NTC then sold Archive systems as "SDMS" systems and only paid Kelly on sales of Archive single-instrument connectivity licenses. NTC leveraged customers' need for Archive to be able to sell UV to those customers under terms that violated NTC's duty of good faith and fair dealing owed to Kelly. NTC also gave away hundreds of thousands of Archive instrument-connectivity licenses in order to close SDMS deals, which, again, violated NTC's duty of good faith and fair dealing owed to Kelly.

Proof that this occurred is the fact that in 2000, sales of UV software, as reported by NTC, exceeded sales of Archive software. Sworn testimony of NTC employees establishes that NTC did not have a UV product available to sell until June of 1999 and that the product had a sales cycle of over one year, meaning that no appreciable sales of UV should have been expected until the second half of 2000. In a patent infringement suit that NTC initiated against Scientific Software, Inc., NTC submitted affidavits of customer surveys, taken in September of 1999, relating to customers' views of its products. Each of the three customers touted the benefits of and their appreciation of Archive, with one customer indicating that it had been using Archive since before NTC acquired it. Only one referenced UV, indicating that it was in the pilot stage, and it would be some time before a decision was made to implement UV, as implementation of UV would require system upgrades and corporate buy-in. In short, as of September of 1999, when trying to make the point in the patent litigation that NTC had customers that liked and valued UV, all it could present was customer interviews demonstrating an appreciation of Archive and one customer interview in which the customer indicated that it had an ongoing UV trial but would not be ready to make a purchasing decision for many months.

Despite this evidence, NTC reported UV sales in 2000 that exceeded Archive sales, even though Archive had an existing transaction pipeline, had been on the market for years, and was required for purchase by regulated pharmaceutical companies, while UV was merely a new, largely untested product with a long sales cycle. The evidence clearly demonstrates that the way NTC accomplished this was by improperly leveraging the demand for Archive to include UV in sales in a manner that was unfair to Kelly and breached the implied covenant of good faith and fair dealing.

Documents produced by Defendants relating to sales to Schering-Plough provide just one example of how NTC's scheme worked. Schering-Plough was under a consent decree that required it to become compliant with 21 C.F.R. part 11. The company needed to connect over 1,000 instruments in multiple laboratories to more than a dozen Archive systems. In September of 2001, Schering-Plough entered into a contract with NTC for the purchase of 15 Archive systems and 1,000 instrument connectivity licenses. At list price for Archive, this transaction was worth over $3,000,000.00 for the software licenses alone, not including out-year maintenance and services. NTC agreed to a total price of approximately $1,700,000.00. A discount of this magnitude, over 50%, may have been appropriate for an all-Archive transaction given the size of the sale. However, Kelly only received payment on $434,000.00 worth of Archive instrument connectivity and Restore licenses (and nothing on Archive Engine or CD Engine licenses, which apparently were provided for free).

The way NTC accomplished this was by including 1,000 UV licenses in the deal, which listed for $3,500.00 each (as compared to $950 for an Archive instrument connectivity license) and then discounting both licenses by 69%. Thus, NTC sold $3,500,000.00 worth of UV licenses for $1,085,000.00 and sold $950,000.00 worth of Archive instrument connectivity licenses for $294,500.00. Schering-Plough also received 1,000 Archive restore licenses, at a 69% discount for $139,500.00, totaling $434,000.00 for Archive licenses as part of a transaction under circumstances where the customer needed (and received) 15 Archive systems with a list value of over $3,000,000.00, but only paid less than 1/6 of that amount for Archive while also receiving 1,000 UV licenses that it did not need and could not possibly have used. Based on NTC's own calculation, only five out of 100 scientists would have a use for UV; 1,000 UV licenses sold to Schering-Plough would indicate that it employed 20,000 scientists. If that were true, then Schering-Plough would be operating far more than 1,000 instruments, and yet that is all the instrument connectivity licenses that it purchased. Moreover, subsequent sales records show that Schering-Plough never renewed annual maintenance on even a dozen of the 1,000 UV licenses that it purchased.

Evidence demonstrates that Schering-Plough did not use UV and only used Archive. Evidence also demonstrates that, with respect to Schering-Plough, NTC converted a potential $3 million-plus sale of Archive alone, which would have netted Kelly 30% of the sale, or over $1,000,000.00, to a sale in which the overwhelming majority of revenues was attributed to UV that the customer did not use. Put simply, a customer with the need to purchase $3,000,000.00 worth of Archive to meet its compliance obligations was able to receive all of the Archive software that it needed, and an equivalent number of UV licenses, in a transaction in which less than a quarter of the revenues was attributed to Archive. NTC accomplished this by heavily discounting both Archive and UV, but pricing UV four times higher than Archive. Thus, NTC converted all of the dollars a customer had allocated to compliance software – Archive – to a sale of both Archive and UV, and Kelly only received payment on less than a quarter of the revenues. This was a clear violation of the implied duty NTC owed Kelly to sell his software under terms that were fair to him.

Uncontroverted evidence demonstrates that NTC repeated this practice with nearly all of its customers, including in its sales its "nice to have" UV product that was inexplicably priced four times higher than its "need to have" Archive product, and discounting both equally and substantially (70-90%), in order to close deals that diverted the majority of customers' compliance budgets away from Archive and towards UV and/or services, while still providing the customers with the compliance software that they needed.

## IV.   Legal Analysis

### A.   Kelly is entitled to the benefit of the bargain of the APA.

It is axiomatic that, with respect to damages, Kelly is entitled to the benefit of the bargain, meaning that he is entitled to his expectation damages for breach of contract. "The usual rule for damages in a breach of contract case is that the injured party should be put in the position he would have been in had the contract been performed." *Hlatky v. Steward Health Care System, LLC*, 484 Mass. 566, 580 (2020) quoting *Situation Mgt. Sys. v. Malouf, Inc.*, 430 Mass. 875, 880 (2000); *see also* Restatement (Second) of Contracts, § 344(a) (1981) (plaintiff in breach of contract action is entitled to damages to

protect "his 'expectation interest,' which is his interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed").

There is no dispute as to whether Kelly performed his obligations pursuant to the terms of the APA. Pursuant to the terms of the APA, Kelly provided to NTC his source code, copyrights, $1.9 million in pending contracts, customer lists, trade names, and other intangible items, with the expectation that NTC would make installment payments to Kelly in the amount of at least $30 million as agreed to by the parties in the APA. However, Defendant NTC, and later Defendant Waters, by and through illegal tying schemes, contrived to deprive Kelly of installment payments that he was due pursuant to the APA. Kelly was entitled to be paid for his source code, copyrights, $1.9 million in pending contracts, customer lists, trade names, and other intangible items, as well as for all derivative works created from Archive. The 2001 amendment to the APA, whereby Kelly agreed to reduce his payments to 5% of revenues from sales of his products, expressly states that most of the consideration for that deal was attributed to the sale of future derivative works, for which NTC admitted that Kelly was entitled to be paid. The amendment to the APA merely confirms the parties' original understanding as expressed in the APA, which was that Kelly was selling all of his intellectual property rights in his software in exchange for installment payments based on a percentage of revenue from sales of derivative works based on his source code. Indeed, NTC's very first sale of Archive was of a derivative work created by NTC from Kelly's source code, and NTC paid Kelly his percentage of that sale.

Thus, Kelly is entitled to the benefit of the bargain, meaning that he is entitled to his expectation damages for breach of contract. In this case, Kelly is entitled to what he reasonably expected to be paid had the contract been honored, plus statutory interest at 12%. Had the contract been honored, Kelly would have received the annual contractual payment cap each year which, taking into account the reduced cap imposed by the 2001 amendment to the APA and deducting the amounts actually received, is $15.3 million, not including the amounts Kelly would have been entitled to had NTC honored its implied covenant of good faith and fair dealing with respect to VP Office.

**B.     Kelly is entitled to payment for derivative works.**

Kelly is entitled to be paid on sales of derivative works as was clearly and irrefutably established

in the 2001 Amendment to the APA. In paragraph 3(d) of that document (attached as Exhibit A), Kelly

agreed to reduce and limit his entitlement to a percentage of the revenues associated with sales of his

software. In exchange, NTC agreed to grant Kelly 500,000 shares of common stock. Significantly, the

2001 Amendment allocated only 100,000 shares of stock as consideration for the reduction in payments

on sales of "existing" versions of Kelly's products and 400,000 shares of stock as consideration for the

reduction in payments on sales of future versions of Kelly's software and derivative products. The 2001

Amendment not only confirms the parties' original understanding that Kelly was entitled to payments on

sales of derivative works (again, the very first sale of Archive was a sale of a derivative work), it

reaffirms the parties' agreement that Kelly was entitled to payments on future sales of derivative works,

albeit at a reduced rate of 5%. Consequently, the question of whether Kelly was entitled to be paid on

sales by NTC and Waters of such products as SDMS Engine, Vision with Restore, Data Transfer

Manager, CD Engine, EDM, hardware and bundles that included such software, and maintenance

revenues on such products, cannot credibly be disputed. Kelly was entitled to a percentage of all revenues

related to those products as expressly acknowledged in the 2001 Amendment to the APA. The 2001

Amendment to the APA demonstrates unequivocally that the primary consideration to be paid to Kelly by

NTC was for the right to develop and sell future derivative works.

**C.     Kelly's claims are not barred by the statute of limitations.**

Defendants contend that Kelly's breach of contract claims are time-barred because the provision

of the APA that granted Kelly the right to audit his quarterly installment reports deprives him of the

benefit of the discovery rule because a contractual audit right makes his breach of contract claims not

"inherently unknowable." Defendants' assertion, however, is not supported by fact or law. In interpreting

the discovery rule in Massachusetts, courts have held that the term "inherently unknowable" is

interchangeable with the term "knew or should have known." *Patsos v. First Albany Corp.,* 433 Mass.

323, 339 n. 8 (2001) ("The 'inherently unknowable standard' is no different from and is used

interchangeably with the 'knew or should have known' standard," citing *Williams v. Ely,* 423 Mass. 467, 470 n. 7 (1996). Defendants, in arguing that Kelly's right to audit his quarterly installment reports requires a finding that Kelly's claims were not "inherently unknowable," rely on inapposite cases. However, Kelly's "right to audit" does not mean that he was under a duty to audit his quarterly installment reports under circumstances where he did not know and had no reason to suspect that they were inaccurate. Moreover, the defense raised by Defendants is not available where, as here, NTC took affirmative steps to conceal its malfeasance.

It is black letter law that "when a defendant fraudulently conceals a cause of action from the knowledge of a plaintiff, the statute of limitations is tolled under G.L. c. 260, sec. 12 for the period prior to the plaintiffs' discovery of the cause of action." *Crocker v. Townsend Oil Co.*, 464 Mass. 1, 8-9 (2012) quoting *Salvas v. Wal-Mart Stores, Inc.*, 452 Mass 337, 375 (2008)(internal citation omitted). *See also Mahoney v. Wells Fargo Bank, N.A.*, Civil Action No. 18-11593-MBB2022, U.S. Dist. LEXIS 87389 *9 (D.Mass. 2022)("Massachusetts court[s] do[] not equate suspicion with knowledge" and instead require[e] actual knowledge, or, as an equivalent, 'full means of detecting the fraud.'") citing *Tracerlab, Inc. v. Indus. Nucleonics Corp.*, 313 F.2d 97, 102 (1st Cir. 1963)(emphasis added). In this case, even if Kelly had exercised his audit rights, he still would not have discovered the various schemes employed by NTC to deprive him of installment payments that he was due because of Defendants' willful concealment of their malfeasance.

Documents produced in discovery, and Rule 30(b)(6) testimony, demonstrate that NTC made installment payments on all sales of Kelly's software starting with "12" and "22" part numbers. An audit of NTC's records, which were independently audited by NTC's accountants, would have revealed nothing more than that NTC paid Kelly based on the recorded sales of his software. Indeed, Kelly effectively did audit NTC sales records in the Customer Sample after those documents were belatedly produced by Defendants in 2009 after protracted negotiations, and even then, he was not able to discern any discrepancy between the recorded sales of his software and what he was entitled to be paid under the APA. It was only after interviewing former NTC employees (which Kelly only knew to do after receiving

11

the Customer Sample documents) that Kelly learned of the various schemes to bundle his software under different part numbers, to include it with hardware sales, to conflate it with "SDMS" products, and to simply give it away in exchange for agreements to purchase U/V software that the customers neither wanted nor used. Mr. McGuinness had refused to let Kelly speak with any customers during the contract period and had instructed NTC employees, on threat of termination, not to speak with Kelly. An audit, without the benefit of explanatory information from employees, would have revealed nothing more than that NTC paid Kelly on all of the Archive software that it recorded having sold. NTC did not record as sales all of the Archive software that it distributed, and software not recorded as a sale would not have been disclosed by an audit of sales records. Thus, through NTC's affirmative steps to tie its UV product to Archive, it was able to hide its malfeasance "in plain sight" in such a way that its malfeasance was inherently "unknowable."

*Stolzoff v. Waste Systems Intern., Inc.*, 58 Mass App. Ct. 747 (2003), is instructive. In *Stolzoff*, the defendant had allegedly concealed the collapse of their landfill mining project by affirmative misrepresentations about its progress. The court held that a fact finder could reasonably find that "by means of numerous false representations made about the status of the Fairhaven project and the company's success in landing other lucrative contracts for other landfill projects," the defendant had "affirmatively concealed the true state of affairs" and thus the plaintiff's cause of action for the underlying fraud. *Id.* at pp. 757-758. Even though the plaintiffs had heard that there were some issues with the company, the court concluded that the plaintiffs did not know or have readily ascertainable information that should have made them realize that they had a right to sue. *Id.* at 758-759. *See also Tracerlab, Inc. v. Industrial Nucleonics Corp.*, *supra* (in which the court denied the defendant's motion for summary judgment on statute of limitations grounds where misconduct by the defendant affirmatively concealed the existence of plaintiff's claim until such time as plaintiff "had knowledge of any specific, tangible or concrete facts which would indicate to it that the defendant" had wrongly appropriated trade secret information)(emphasis added); *Mahoney v. Wells Fargo Bank, N.A.*, *supra*, at *10.

*Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215 (1st Cir. 2005), is

similarly instructive. In *Mass. Eye & Ear Infirmary*, Plaintiff MEEI alleged, *inter alia*, that Defendant

QLT had shared confidential information with a third party (CIBA Vision) despite the existence of a

confidentiality agreement between MEEI and QLT. The district court had granted defendant's motion for

summary judgment on the grounds that the plaintiff had had some knowledge that the defendant had

shared the confidential information with CIBA Vision. The Appeals Court found, however, that the

district court had erred. As in this case, the plaintiff did not claim that that it did not know the full extent

of its injury, but "that it did not know it had been harmed at all." *Id.* at 241. The court noted that "MEEI's

claims are strengthened by the existence of the Confidentiality Agreement and QLT's repeated assurances

that its trade secrets were not being disclosed." *Id.* (emphasis added) The court further noted that "[w]here

a 'defendant[] made representations [he] knew or should have known would induce the plaintiff to put off

bringing suit and . . . the plaintiff did in fact delay in reliance on the representations,'" the statute of

limitations is tolled." *Id.* at 242 citing *Olsen v. Bell Tel. Labs., Inc.*, 388 Mass. 171, 176 (Mass. 1983)

(quoting *White v. Peabody Constr. Co.*, 386 Mass. 121, 134-135 (Mass. 1982)).

        As noted above, NTC's top executives took affirmative steps to prevent Kelly from

communicating with customers and to prevent employees from communicating with Kelly for the clear

purpose of concealing information from Kelly that would have caused him to suspect that NTC was

breaching the APA. Had Kelly been permitted to speak to NTC customers and sales representatives, he

would have learned that the demand for Archive far outstripped the demand for U/V, which is the opposite

of what Mr. McGuinness told him. Defendants "made representations [they] knew or should have known

would induce [Kelly] to put off bringing suit and . . . the plaintiff did in fact delay in reliance on the

representations." *Id.* Thus, Defendants' affirmative efforts at concealment tolled the statute of limitations,

and Defendants cannot avail themselves of a statute of limitations defense when they took affirmative

steps to "fraudulently conceal a cause of action from the knowledge of a plaintiff." *Salvas v. Wal-Mart

Stores, Inc.*, 452 Mass. at 375.

Moreover, in Massachusetts, the principle of equitable estoppel functions "to prevent one from benefiting from his own wrongdoing and to avoid injustice." *Barrie-Chivian v. Lepler*, 87 Mass. App. Ct. 683, 686 (2015) citing *Harrington v. Fall River Hous. Authy.*, 27 Mass. App. Ct. 301, 307 (1989). *See MacKeen v. Kasinskas*, 333 Mass. 695, 698 (1956), quoting from *McLearn v. Hill*, 276 Mass. 519, 524 (1931) (the purpose of the doctrine is "the prevention of results contrary to good conscience and fair dealing"). The essential elements of equitable estoppel are (1) "[a] representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made;" (2) "[a]n act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made;" and (3) "[d]etriment to [the reliant] person as a consequence of the act or omission" (emphasis supplied). *Turnpike Motors, Inc. v. Newbury Group, Inc.*, 413 Mass. 119, 123 (1992), quoting from *Cleaveland v. Malden Sav. Bank*, 291 Mass. 295, 297-298 (1935). Here, extensive evidence demonstrates that Defendants took affirmative steps to conceal their malfeasance; that Kelly reasonably relied on the sales data presented by Defendants; and that Kelly was deprived of the benefit of the contract as a result of Defendants' malfeasance. Accordingly, in order to prevent "results contrary to good conscience and fair dealing," Defendants should be estopped from asserting that Kelly should be denied relief when their malfeasance prevented him from knowing that he was being harmed.

> **D.    NTC's contractual breaches were so willful and material as to justify the remedy of rescission.**

The uncontroverted evidence demonstrates that NTC breached the implied covenant of good faith and fair dealing by engaging in sales schemes (such as selling his software under part numbers for which he would not receive payment pursuant to the APA) that were designed to deprive him of installment payments that he was entitled to under the express terms of the APA. NTC's contractual breaches were so material as to justify the remedy of rescission, voiding the APA and entitling Kelly to the value of what he sold to NTC, which the parties agreed was worth $30 million. To justify rescission, the breach must be "material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the

object of the parties in making the contract." *Septembertide Publ'g, B.V. v. Stein and Day, Inc.,* 884 F.2d

675, 678 (2d Cir. 1989) (internal quotation marks and citation omitted); *Curet v. Velasquez v. ACEMLA de*

*P.R., Inc.* No. 06-1014 (ADC) 2010 U.S.Dist. LEXIS 143636 (D. P.R. March 31, 2010) (Delgado-Colon,

J.). Examples of material breaches warranting rescission arise when the assignee or licensee fails to make

true reports of royalties as required under contract, fails to permit inspection of books as required under

contract, or fails to render the copyright productive under the circumstances. *Curet, supra,* citing 3-10

*Nimmer on Copyright* § 10.15. In this case, NTC's breaches were sufficiently material and willful <u>and</u> so

substantial and fundamental as to justify rescission of the APA. NTC failed to permit inspection of its

books, failed to make true reports of the royalties owed to Kelly pursuant to the APA provisions, and

failed to make his copyrighted materials productive. More specifically, during the term of the APA,

uncontroverted and admissible evidence demonstrates that NTC only made installment payments to Kelly

totaling an amount approximately equal to the revenue pipeline that Kelly assigned to NTC as part of the

transaction. In other words, NTC never actually paid Kelly anything at all – it just distributed to him, over

the course of five years, the same revenues that Kelly assigned to NTC on the day the APA was signed. As

another example, NTC purchased software called VP Office. NTC never made that copyright productive

after acquiring it. These uncontroverted facts demonstrate willful and meaningful breaches such that the

appropriate remedy would be rescission of the contract and an award of $30-$35 million, which is the

value of the transferred assets as agreed to by the parties.

      Respectfully submitted,


/s/
Jeffrey J. Upton, BBO #552221
jeff@uptonslaw.com
The Upton Law Group
P.O. Box 507
Milton, MA 02186
(617) 308-4647
 Counsel to Plaintiff

William F. Swiggart, BBO#490670
wfs@swiggartagin.com
Swiggart & Agin, LLC
400 Tradecenter Drive
Woburn, MA 01801
617-742-0110

Counsel to Plaintiff



Dated: April 4, 2024




CERTIFICATE OF SERVICE


I, Jeffrey J. Upton, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 4, 2024.

/s/ Jeffrey J. Upton